## ALBERT A. and LOIS M. SCOUTEN *v.* DEPARTMENT OF REVENUE

Plaintiffs appeared in persona propria.

Defendant appeared by and through Alfred B. Thomas, Assistant Attorney General, Salem.

Decision for plaintiffs rendered January 18, 1974.

CARLISLE B. ROBERTS, Judge.

Plaintiffs appealed from the defendant's Order No. I-73-1, dated February 28, 1973, assessing additional personal income taxes for the calendar year 1969. The question presented to the court was whether, under the facts, the plaintiffs were entitled to capital gains treatment of a lump sum paid to the plaintiff-husband by his corporate employer in the year 1969, the distribution terminating a qualified employees' profit-sharing plan.

The court finds that the plaintiff-husband's employer, the Bate Plywood Company, had established a profit-sharing plan for salaried employees. The plan was a qualified employees' trust under Int Rev Code of 1954, § 401 (a), and was tax exempt under Int Rev Code of 1954, § 501 (a). On May 28, 1969, the Bate Plywood Company became the wholly owned subsidiary of Fibreboard Corporation, all of the outstanding shares of Bate being exchanged for Fibreboard stock. Under the terms of the stock-exchange agreement, the profit-sharing plan of Bate was terminated as of May 28, 1969, the date on which the exchange took place. Funds of the plan were distributed to the employees shortly after that date. Fibreboard operated Bate as a wholly owned subsidiary from May 28, 1969, until December 1970, when Bate was merged into Fibreboard, ending the corporate life of Bate.

The distribution of funds, paid for the rendition of personal services, would be treated as ordinary income if it were not for the provisions of Int Rev Code of 1954, § 402 (a) (2), which provides, in pertinent part:

> "In the case of an employees' trust described in section 401 (a), which is exempt from tax under section 501 (a), if the total distributions payable with respect to any employee are paid to the distributee within 1 taxable year of the distributee on account of the employee's death or *other separation from the service,* * * * shall be considered a gain from the sale or exchange of a capital asset held for more than 6 months. * * *" (Emphasis supplied.)

As stated in Grayck, *Taxation of Distributions from Qualified Plans,* 28 Tax L Rev 233 (1973), at 250:

> "The seemingly innocent requirement of 'separation from the service' has been fraught with

difficulty and has led to substantial litigation in cases of corporate reorganizations, liquidations, sales of business assets and transactions involving changes of corporate ownership. * * *"

A helpful discussion of the subject may be found in a note, Ruby, *Qualified Plan Distributions: Changes in Corporate Structure or Ownership,* 24 Tax L Rev 269 (1969). The note includes an excellent description of the Revenue Rulings of the federal Internal Revenue Service and of many of the legal decisions which seek to interpret the words "separation from the service" as used in Int Rev Code of 1954, § 402 (a) (2), revealing much confusion and a number of contradictions, and then states, at 288:

"The divergent views on the separation from the service principle may be better understood if the divergency is considered in the light of the underlying purpose of the principle. The underlying purpose is of course, clear, since in 1942 Congress expressly determined that plan distributions made to employees on account of separation from the service should be taxable at capital gain rates.

"The difficulty is not in clarity of purpose but in the breadth of application—and the difficulty stems from the absence of rationale for capital gain treatment. For unlike property which has appreciated in value due to the action of the marketplace over a period of time, a participant's interest in a plan represents pure and simple compensation—otherwise taxable at ordinary income rates.

"How there occurred in 1942 what would today be called a tax benefit 'happening' or a 'capital gains-in' was succinctly described in 1957 by the present Assistant Secretary of the Treasury for Tax Policy:

" 'The whole matter of capital gains for pension-trust terminations, for example, started with an

error in judgment on the Treasury's part in 1942 when it acquiesced in capital-gain treatment as a solution for the bunched-income problem present in this area. It so happened that the problem was presented in the context of a pension trust in which only lower-bracket taxpayers received lump-sums [*sic*] distributions, and as an *ad hoc* solution the result was not too objectionable. But there was a failure to think through the problem, a failure caused by the lack of time and lack of knowledge about the provisions respecting termination of pension trusts. Thus the provision got its start—and the rule of the camel's nose is cardinal in the field of tax privileges.' [Surrey, *The Congress and the Tax Lobbyist—How Special Tax Provisions Get Enacted,* 70 Harv L Rev 1145, 1161 (1961).]

"Thus, Congress in this area has not directed the Service and the courts to look to the nature of the assets, the holding period and the manner of disposition; it has decreed that capital gain treatment is available if other criteria—wholly unrelated to those of capital gains and losses in general— are present. It is this absence of analytical or conceptual grounds for capital gain treatment that undoubtedly has led to the illogical results in the cases —howsoever such results may be supported by the statute—and has led some courts, including the Tax Court in *Gittens,* to construe the statutory provision so as to severely limit the availability of capital gain benefits. While one may applaud such a result from the viewpoint of tax policy, it leaves something to be desired from the viewpoint of statutory construction." (Footnotes omitted.)

At 275, Mr. Ruby describes the different treatment given by the courts to four cases, each emanating from the same transaction. Most of the cases cited by counsel in argument before this court are discussed by him. Mr. Ruby writes, at 281:

"With the decisions in *Gittens* [49 TC 419 (1968)] and *Haggart* [*Haggart v. Rockwood,* 274

F Supp 817 (DND 1967)] the courts have finally locked horns with respect to distributions occurring in the course of changes in corporate ownership, structure, or both. * * *"

It is clear from a study of the cases and Revenue Rulings cited by counsel, corroborated by Mr. Ruby, that there is no single federal rule applicable to the facts in the present case. For example, compare *Smith v. United States,* 460 F2d 1005 (6th Cir 1972), 72-1 USTC ¶ 9412, 29 AFTR2d 72-1101, with *Victor S. Gittens,* 49 TC 419 (1968), and *Haggart v. Rockwood,* * 274 F Supp 817 (DND 1967), 20 AFTR2d 5460. This is not uncommon under our federal judicial system in which many courts, over a wide area, have jurisdiction. The Commissioner of Internal Revenue seeks resolution from these difficulties through his acquiescence and nonacquiescence to particular decisions, often forcing an issue to the U. S Supreme Court for resolution. This is accomplished only after the expenditure of much time and effort. (An example is described in *Henderson v. Dept. of Rev.,* 5 OTR 153 (1972).)

■ What is the Oregon Department of Revenue to do when there is more than one federal rule applicable to a given state of facts? The legislature has provided a tool for cutting such Gordian knots. It is found in ORS 316.032 (2):

"In so far as is practicable in the administration of this chapter, the department shall apply and follow the administrative and judicial interpretations of the federal income tax law. When a

---

* The case was subsequently reversed in *United States v. Haggart,* 410 F2d 449 (8th Cir 1969), 23 AFTR2d 69-1326. The reversal by the Court of Appeals indicates a trend toward resolution of the conflict in the judicial quarter but is of insufficient help in eliminating conflicts in a case involving the 1969 tax year.

provision of the federal income tax law is the subject of conflicting opinions by two or more federal courts, the department shall follow the rule observed by the United States Commissioner of Internal Revenue until the conflict is resolved. Nothing contained in this section limits the right or duty of the department to audit the return of any taxpayer or to determine any fact relating to the tax liability of any taxpayer."

The rule followed by the Commissioner of Internal Revenue during the year before the court is to be found in Rev Rul 58-95, 1958-1 Cum Bull 197, and Rev Rul 58-383, 1958-2 Cum Bull 149. Under facts in these two Revenue Rulings which were closely similar to those in the present case, the Commissioner allowed the use of capital gains, finding a "separation" from service due to the corporate reorganizations. (This court recognizes that many variations can be found in this theme, giving rise to many quibbles and some serious disputes, seeking to distinguish the cases, but has concluded that the Commissioner's principle as expressed in the two Cumulative Bulletins is applicable in the present instance.)

Defendant's Order No. I-73-1 is set aside as void under ORS 316.032. The deficiency assessed against plaintiffs for the income tax year 1969 must be abated and the income tax return accepted as filed with respect to the issues raised in this suit.

Note should be taken that the rule established by the Cumulative Bulletins cited above cannot be followed after September 18, 1972. The Internal Revenue Service, concerned by the danger of abuse of the capital gains provision through contrived corporate reorganizations, issued Rev Rul 72-440, 1972-2 Cum Bull 225, revoking Revenue Rulings 58-95 and 58-383 (among

others) "since the rationale in those Revenue Rulings is inconsistent with the rationale in this Revenue Ruling." However, the new ruling particularly provides that it will not be applied to deny long-term capital gain treatment to any distribution made on or before September 18, 1972, "if such long-term capital gain treatment would have been permitted by any of the Revenue Rulings revoked herein."